STATE of Minnesota, Respondent,

v.

Kristen Rae MANYPENNY, Appellant.

No. CX–02–855.

Supreme Court of Minnesota.

July 1, 2004.

Bradford William Colbert, St. Paul, MN, for Appellant.

1. The White Earth Band of Chippewa Indians is the White Earth Band of Ojibwe, a constituent band of the Minnesota Chippewa Tribe. Because the cooperative agreement is be-

Mike Hatch, Minnesota State Attorney General, St. Paul, MN, Joseph Evans, Becker County Attorney, James Ward Donehower, Assistant Becker County Attorney, Detroit Lakes, MN, for Respondent.

Mark A. Anderson, St. Paul, MN, for Amicus Curiae Minnesota Chippewa Tribe's.

Joseph Fredericks Halloran 246, St. Paul, MN, for Amicus Curiae Prairie Island Indian Community's.

Terrence Jon Rheault, Law Office of Charles W. LaDue, Coon Rapids, MN, for Amicus Curiae White Earth Band of Ojibwe's.

Frank Warren Bibeau, Leech Lake Band of Ojibwe, Cass Lake, MN, for Amicus Curiae Leech Lake Band of Ojibwe's.

## OPINION

BLATZ, Chief Justice.

Appellant Kristen Rae Manypenny was convicted of fourth-degree assault of a peace officer pursuant to Minn.Stat. § 609.2231, subd. 1 (2000), obstructing legal process pursuant to Minn.Stat. § 609.50, subds. 1(2), 2(2) (2000), and disorderly conduct pursuant to Minn.Stat. § 609.72, subd. 1(1) (2000). The convictions arose out of Manypenny's conduct and subsequent arrest by tribal Officer Chris Benson on the White Earth Reservation on April 29, 2001. Officer Benson was enforcing Minnesota criminal statutes on the reservation under an agreement entered into between the White Earth Band of Chippewa Indians[1] ("the Band") and Becker County.

tween Becker County and the "White Earth Band of Chippewa Indians," the Band is referred to as such.

Manypenny's appeal to the court of appeals sets forth one principal claim: that the evidence was insufficient to sustain her conviction for assaulting a peace officer. She based this claim on her assertion that the cooperative agreement between the Band and Becker County did not give Officer Benson authority to effectuate a valid arrest of a Band member on the White Earth Reservation because the state had not properly retroceded its jurisdiction to the federal government and therefore the state retained exclusive jurisdiction over criminal matters. *State v. Manypenny,* 662 N.W.2d 183, 187 (Minn.App.2003). Manypenny maintained that the federal government had not granted the states the right to enter into cooperative agreements with Indian tribes to allow tribal peace officers to enforce criminal statutes on reservations. *Id.* at 187. Without such a grant of federal authority, Manypenny contended that the arrest was not "lawful" and that the elements of fourth-degree assault were not proven.[2] *Id.* at 186.

The court of appeals denied Manypenny's claim, holding that: (1) the state was not required to formally retrocede its jurisdiction in order to enter into cooperative agreements with tribal authorities to provide law enforcement services on Indian reservations, and therefore the evidence was sufficient because the arrest by Officer Benson was lawful; and (2) responding to an argument raised in a pro se brief, Manypenny failed to sustain her burden of demonstrating that the state's cooperative agreement with tribal police violated the state or federal constitutions. *Id.* at 188–89. It is from this decision that this appeal was brought. We affirm.

At the time of the arrest, Officer Benson was a licensed peace officer in accordance with Minn.Stat. § 626.845, subd. 1 (2002),[3] and employed by the White Earth Band. Minnesota Statutes § 626.93 (2002) recognizes the ability of tribes to enter into cooperative agreements with state law enforcement agencies when certain requirements are met:

Subd. 2. A tribe may exercise authority under subdivision 3 only if it satisfies the following requirements:

(1) the tribe agrees to be subject to liability for its torts and those of its officers, employees, and agents acting within the scope of their employment or duties arising out of a law enforcement agency function conferred by section 626.84, subdivision 1, paragraph (h), to the same extent as a municipality under chapter 466, and the tribe further agrees, notwithstanding section 16C.05, subdivision 7, to waive its sovereign immunity with respect to claims arising from this liability;

(2) the tribe files with the board of peace officer standards and training a bond or certificate of insurance for liability coverage * * *;

(3) the tribe files with the board of peace officer standards and training a

---

**2.** Minnesota's fourth-degree assault statute reads, "Whoever physically assaults a peace officer licensed under section 626.845, subdivision 1, when that officer is *effecting a lawful arrest* or executing any other duty imposed by law is guilty of a gross misdemeanor * * *." Minn.Stat. § 609.2231, subd. 1 (2002) (emphasis added).

**3.** Minnesota Statutes § 626.845, subd. 1(d), gives the Board of Peace Officer Standards

and Training the power to "license peace officers who have satisfactorily completed certified basic training programs, and passed examinations as required by the board." A "peace officer" is defined to include "a peace officer who is employed by a law enforcement agency of a federally recognized tribe * * * and who is licensed by the board." Minn. Stat. § 626.84, subd. 1(c)(2) (2002).

certificate of insurance for liability of its law enforcement officers * * *;

(4) if the tribe's governing body has authorized its peace officers to enforce criminal laws within the boundaries of the tribe's reservation, the tribe agrees to be subject to section 13.82 [regulating comprehensive law enforcement data] and any other laws of the state relating to data practices of law enforcement agencies.

Subd. 3. Concurrent jurisdiction. If the requirements of subdivision 2 are met and the tribe enters into a cooperative agreement pursuant to subdivision 4, the tribe shall have concurrent jurisdictional authority under this section with the local county sheriff within the geographical boundaries of the tribe's reservation to enforce state criminal law.

Minn.Stat. § 626.93, subds. 2, 3. The Band had fulfilled all of the statutory requirements of Minn.Stat. § 626.93 to authorize it to exercise concurrent law enforcement authority with Becker County.

The purpose of the cooperative agreement is set forth in subdivision 4:

Subd. 4. Cooperative agreements. In order to coordinate, define, and regulate the provision of law enforcement services and to provide for mutual aid and cooperation, governmental units and the tribe shall enter into agreements under section 471.59. For the purposes of entering into these agreements, the tribe shall be considered a "governmental unit" as that term is defined in section 471.59, subdivision 1.

*Id.*, subd. 4. Importantly, subdivision 6 of Minn.Stat. § 626.93 further defines the scope of the statute and the cooperative agreements entered into in accordance with it. Subdivision 6 expressly states: "This section is limited to *law enforcement authority* only, and nothing in this section shall affect any other jurisdictional rela-

tionships or disputes involving a tribe or current reservation boundaries." *Id.*, subd. 6 (emphasis added).

On May 22, 2000, pursuant to subdivision 4, the Band and Becker County entered into a "cooperative agreement" for the purposes of coordinating law enforcement services, establishing procedures, and preserving the parties' respective jurisdictions. The agreement expressly authorizes the Band to concurrently enforce the criminal laws of the State of Minnesota within the area of the reservation that lies within Becker County, so long as the Band agrees to waive its sovereign immunity and comply with several procedural requirements, as required of all agreements entered into pursuant to Minn.Stat. § 626.93.

The agreement entered into between the Band and Becker County specifically addresses the issue of jurisdiction. In relevant part, paragraph 5 of the cooperative agreement provides:

Nothing in this agreement shall be construed to limit or to release the County or Sheriff from criminal jurisdiction or responsibility otherwise possessed by the County under applicable law. The Sheriff or officer in control of the Sheriff's Department shall have the authority to control any designated crime scene, and law enforcement officers of the Band will cooperate with the direction of the Sheriff or officer in charge.

With the cooperative law enforcement agreement in place, on April 29, 2001, Officer Benson was dispatched to Linda Bevins' home on the White Earth reservation to investigate a call regarding a disturbance of the peace. When Officer Benson arrived at the scene, he observed appellant Kristen Rae Manypenny outside, yelling at the individuals inside of the house. Officer Benson attempted to convince Manypenny

to leave the property, but Manypenny refused, continuing to yell at the residents of the house and Officer Benson. He then told her that if she did not go home she would be arrested for disorderly conduct. Manypenny did not leave or desist in her behavior.

When Officer Benson attempted to place Manypenny under arrest she physically resisted the arrest, screaming and attempting to wrestle herself away from him as he handcuffed her. When put into Officer Benson's squad car, Manypenny kicked the car and then Officer Benson, kicking him twice in the chest, once in the jaw, once in the left cheek, and at least once in the arm. As a result of the kicking, Officer Benson sustained a cut on the inside of his lip, several cuts and abrasions on his hand, and a broken watch. As he drove Manypenny to the Becker County Jail, she continued to scream at him and kick the inside of his car. Manypenny remained physically uncooperative in the jail sallyport, elevator, booking room, and on the way to her holding cell.

■■■ Pertinent to the factual background of the case is the structure of criminal jurisdiction and law enforcement authority on tribal reservations in Minnesota, and particularly on the White Earth Reservation. Generally, state court jurisdiction over matters involving Indians is governed by federal statute or case law. *State v. Stone,* 572 N.W.2d 725, 728 (Minn. 1997) (citing *Gavle v. Little Six, Inc.,* 555 N.W.2d 284, 289 (Minn.1996)). As to the sovereignty of the tribes, the United States Supreme Court has consistently held that Indian tribes retain "attributes of sovereignty over both their members and

their territory." *Id.* (citing *California v. Cabazon Band of Indians,* 480 U.S. 202, 207, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987); *United States v. Mazurie,* 419 U.S. 544, 557, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975)). A tribe's sovereignty is "dependent on, and subordinate to, only the Federal Government, not the States." *Id.* (citing *Cabazon,* 480 U.S. at 207, 107 S.Ct. 1083; *Washington v. Confederated Tribes of Colville Indian Reservation,* 447 U.S. 134, 154, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980)). However, it is established that state laws may be applied to tribal members within reservation boundaries if Congress has expressly so provided. *Id.* (citing *Cabazon,* 480 U.S. at 207, 107 S.Ct. 1083).

■■ In 1953, Congress passed Public Law 280. 18 U.S.C. § 1162 (2002).[4] Public Law 280 expressly addressed criminal jurisdiction within tribal boundaries in Minnesota and five other states, for the purposes of combating the problem of lawlessness on certain reservations and the lack of adequate tribal law enforcement. *Stone,* 572 N.W.2d at 729 (citing *Bryan v. Itasca County,* 426 U.S. 373, 379, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976)). In relevant part, Public Law 280 states that:

(a) Each of the States or Territories listed in the following table shall have jurisdiction over offenses committed by or against Indians in the areas of Indian country listed opposite the name of the State or Territory to the same extent that such State or Territory has jurisdiction over offenses committed elsewhere within the State or Territory, and the criminal laws of such State or Territory shall have the same force and effect within such Indian country as they have

---

4. Public Law 280 is the commonly used name for the collective provisions of federal legislation providing for state exercise of either civil or criminal jurisdiction in Indian country. *See, e.g., State v. R.M.H.,* 617 N.W.2d 55, 59 (2000). While the portion of Public Law 280 relevant to this case is 18 U.S.C. § 1162, it will be referred to generally as Public Law 280 throughout this opinion.

elsewhere within the State or Territory * * *.

18 U.S.C. § 1162(a). For Minnesota, the table includes "[a]ll Indian country within the state, except the Red Lake Reservation * * *." *Id.*

■ Our court has recognized that Public Law 280 grants "the state of Minnesota broad criminal and limited civil jurisdiction over all Indian country in the state, with the exception of the Red Lake Reservation." *Stone*, 572 N.W.2d at 728. Important to the resolution of this case is that Public Law 280, absent retrocession, authorizes Minnesota to enforce the same criminal laws within tribal boundaries as would be enforced elsewhere in the state.

■ While Congress has authorized Minnesota and other states to exercise broad criminal jurisdiction over tribes, Congress further amended Public Law 280 in 1968 to allow state governments to retrocede their jurisdiction over the crimes committed by or against Indians on tribal land to the federal government. 25 U.S.C. § 1323 (2002). Retrocession is "a state's return to the federal government of jurisdiction over criminal and/or civil matters previously granted to the state by Congress." *U.S. v. Merrick*, 767 F.Supp. 1022, 1023 (D.Neb.1991).

On appeal, Manypenny argues that the state did not prove the necessary elements of fourth-degree assault because the arrest of Manypenny by tribal Officer Benson was not "lawful," and therefore her conviction cannot stand. Specifically, Manypenny asserts that the cooperative agreement between Becker County and the Band violates Public Law 280 because Public Law 280 has conferred exclusive criminal jurisdiction for the White Earth Reservation on the State of Minnesota, and thus Officer Benson, as a tribal officer, was not a police officer affecting a lawful arrest. To support her assertion that the cooperative

agreement is a violation of federal law, Manypenny sets forth two main arguments: (1) Public Law 280 preempts the cooperative agreement between Becker County and the Band because Public Law 280 clearly "orders" the State of Minnesota to assume jurisdiction over criminal law on Indian reservations; and (2) Congress has established retrocession as the method for states to divest themselves of criminal jurisdiction under Public Law 280, and the state, through Becker County, did not properly retrocede its jurisdiction.

I.

■ This appeal asks our court to determine whether the cooperative agreement entered into between the Band and Becker County runs afoul of Public Law 280. We are first presented with the question whether Public Law 280 preempts Minn.Stat. § 626.93 and the authorized cooperative agreements that flow from it.

■ Statutory interpretation raises questions of law, which we review de novo. *State by Beaulieu v. RSJ, Inc.*, 552 N.W.2d 695, 701 (Minn.1996). This case also raises questions of jurisdiction, which this court reviews de novo. *State v. R.M.H.*, 617 N.W.2d 55, 58 (Minn.2000).

■ The United States Supreme Court has formulated a preemption inquiry in the context of Indian law. State law is preempted by federal law in this context "if it interferes or is incompatible with federal and tribal interests reflected in federal law, unless the state interests at stake are sufficient to justify the assertion of state authority." *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 216, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987) (quoting *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 333, 103 S.Ct. 2378, 76 L.Ed.2d 611 (1983)). Preemption inquiry

should be performed with an eye towards "traditional notions of Indian sovereignty and the congressional goal of Indian self-government, including its 'overriding goal' of encouraging tribal self-sufficiency and economic development." *Id.* Manypenny argues that the doctrine of preemption prohibits the State of Minnesota from "surrendering" its exclusive jurisdiction to the Band via the cooperative agreement. She maintains that by the enactment of Public Law 280 "Congress clearly, and explicitly, ordered the State of Minnesota to assume jurisdiction over criminal law on Indian reservations," and, therefore, Minnesota is barred from assigning the jurisdiction conferred on it to Indian tribes. To support this argument, Manypenny cites the United States Supreme Court as acknowledging a "trend * * * away from the idea of inherent Indian sovereignty as a[n independent] bar to state jurisdiction and toward reliance on federal pre-emption" as a basis to hold that the cooperative agreement is preempted by federal law. *Three Affiliated Tribes of Fort Berthold Reservation v. Wold Engineering,* 476 U.S. 877, 884, 106 S.Ct. 2305, 90 L.Ed.2d 881 (1986).

We are not persuaded by Manypenny's argument. While Manypenny is correct in her assertion that Public Law 280 expressly demonstrates Congress's intention that Minnesota assume jurisdiction of criminal matters, the existence of the cooperative agreement does not necessarily mean that Minnesota has surrendered jurisdiction to the Band. The plain language of the cooperative agreement would suggest otherwise. The cooperative agreement specifically states that the agreement should not be "construed to limit or to release the County or Sheriff from criminal jurisdiction or responsibility otherwise possessed by the County under applicable law." The cooperative agreement also states that the "Sheriff or officer in control of the Sher-

iff's Department shall have the authority to control any designated crime scene, and law enforcement officers of the Band will cooperate with the direction of the Sheriff or officer in charge," indicating that jurisdiction has not been surrendered to the Band. Moreover, Manypenny has been prosecuted by state officials in the state courts. Therefore, we conclude that Becker County is sharing its law enforcement authority with the Band, and has not surrendered its jurisdiction to the Band.

Contrary to Manypenny's assertions, Minn.Stat. § 626.93 and the cooperative agreements that flow from it are compatible with the federal and tribal interests reflected in federal law. As previously noted, Public Law 280 was created "to combat the problem of lawlessness on certain reservations and the lack of adequate tribal law enforcement." *Bryan,* 426 U.S. at 379, 96 S.Ct. 2102; *Stone,* 572 N.W.2d at 729. In the statute's own words, cooperative agreements "coordinate, define, and regulate the provision of law enforcement services and * * * provide for mutual aid and cooperation * * *." Minn.Stat. 626.93, subd. 4. In our view, such language reflects the same goals underlying the enactment of Public Law 280, and are shared by the state and the tribes, as reflected by the joined plea of state and amicus tribes that the cooperative agreements be allowed to continue. Consistent with the United States Supreme Court's concerns set forth in *Cabazon,* the statute also encourages (1) tribal self-sufficiency by allowing the tribes to participate in the law enforcement of the state, as opposed to making tribal members rely solely on state law enforcement agencies; and (2) economic development by providing additional employment opportunities within tribal boundaries.

As further support of her preemption argument, Manypenny points to other fed-

eral statutes that expressly provide for cooperative agreements between states and tribes.[5] Without such similar explicit provisions in Public Law 280, Manypenny argues that Congress did not intend to allow the kind of cooperative agreement at issue here, in essence interpreting Congress's silence as a prohibition. However, the presence of provisions allowing for cooperative agreements in other areas of federal law does not make the cooperative agreements at issue here incompatible

with federal and tribal interests, and therefore such a preemption argument fails.[6] Consequently, we hold that the doctrine of preemption does not prohibit the cooperative law enforcement agreement entered into between Becker County and the Band pursuant to Minn.Stat. § 626.93.

## II.

■ Next, we are presented with the issue whether Minnesota unlawfully retro-

**5.** *See* 25 U.S.C. § 2710(d) (2002) (providing for Tribal–State "compacts" regarding particular gaming activities) (held unconstitutional on other grounds in *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 47, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996)); 42 U.S.C. § 654(7) (2002) (requiring a state plan for child and spousal support to provide for entering into cooperative agreements with Indian tribes).

**6.** In fact, the United States Supreme Court, in dicta, appeared to allow for the possibility of such agreements in *Nevada v. Hicks,* 533 U.S. 353, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001). In *Hicks,* the Supreme Court was asked to determine whether a tribal court had jurisdiction to adjudicate alleged tortious conduct of state wardens executing a search warrant on a reservation for evidence of a crime committed outside of the reservation boundaries by Hicks, a tribal member. *Id.* at 357, 121 S.Ct. 2304. Justice Scalia, writing for the majority, cited *Montana v. United States,* 450 U.S. 544, 564, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), for the assertion that, "Where nonmembers are concerned, the 'exercise of tribal power *beyond what is necessary to protect tribal self-government or to control internal relations* is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation.'" *Hicks,* 533 U.S. at 359, 121 S.Ct. 2304. In a footnote to this statement, the Court noted that *Montana* recognized an exception to this rule where nontribal members entered into consensual relationships with the tribe and its members, characterizing such relationships, other than commercial dealing, contracts and leases, as "private consensual relationships." *Id.* at 359 n. 3, 121 S.Ct. 2304. In a concurring opinion, Justice O'Connor disagreed with the court's narrow interpretation of the exception set forth in *Montana* by stating:

The Court's decision in *Montana* did not and could not have resolved the complete scope of the * * * exception * * *.
State governments may enter into consensual relationships with tribes, such as contracts for services or shared authority over public resources. Depending upon the nature of the agreement, such relationships could provide official consent to tribal regulatory jurisdiction. * * * In addition, *there are a host of cooperative agreements between tribes and state authorities* to share control over tribal lands, to manage public services, *and to provide law enforcement.* See, *e.g.,* * * * Minn.Stat. 626.90 *et seq.* (Supp. 2001) (authorizing cooperative agreements between state law enforcement and tribal peace officers) * * *.
* * * Without a full understanding of the applicable relationships among tribal, state, and federal entities, there is no need to create a *per se* rule that forecloses future debate as to whether cooperative agreements, or other forms of official consent, could ever be a basis for tribal jurisdiction. *Hicks,* 533 U.S. at 392–94, 121 S.Ct. 2304 (emphasis added). Justice Scalia responded to this criticism by stating, "The concurrence concludes * * * that we would invalidate express or implied cessions of regulatory authority * * * contained in state-tribal cooperative agreements, including those pertaining to mutual law enforcement assistance * * *. This is a great overreaching." *Id.* at 372, 121 S.Ct. 2304. In sum, while the issue to be determined in *Hicks* differs from the issue in the present case, the dicta suggests that the United States Supreme Court did not consider cooperative agreements to be displaced by federal law.

ceded its jurisdiction under Public Law 280 by conferring law enforcement authority on the Band. Retrocession is "a state's return to the federal government of jurisdiction over criminal and/or civil matters previously granted to the state by Congress." *Merrick,* 767 F.Supp. at 1023. The United States Code, 25 U.S.C. § 1323(a) (1968), states that:

> The United States is authorized to accept a retrocession by any State of all or any measure of the criminal or civil jurisdiction, or both, acquired by such State pursuant to the provisions of section 1162 of Title 18 * * *.

*Id.* Further, an executive order enacted shortly after 25 U.S.C. § 1323(a) clarifies the process by which the retrocession authorized therein becomes complete by stating:

> * * * the Secretary of the Interior is hereby designated and empowered to exercise, without the approval, ratification, or other action of the President or of any other officer of the United States, any and all authority conferred upon the United States by * * * 25 U.S.C. 1323(a) * * *: *Provided,* That acceptance of retrocession of all or any measure of civil or criminal jurisdiction, or both, by the Secretary hereunder shall be effected by publication in the FEDERAL REGISTER of a notice which shall specify the jurisdiction retroceded and the effective date of the retrocession: *Provided further,* That acceptance of such retrocession of criminal jurisdiction shall be effected only after consulta-

tion by the Secretary with the Attorney General.

Exec. Order No. 11435, 33 Fed.Reg. 17,339 (Nov. 21, 1968). Manypenny argues that Congress provided this method of retrocession by which Minnesota could have given up its exclusive jurisdiction, and that because Minnesota did not avail itself of this method it could not devise its own method for divesting itself of jurisdiction and transferring it to the tribe.

The cooperative agreement gives concurrent powers of arrest and law enforcement to state-licensed tribal police officers, and the State of Minnesota, through Becker County, retains jurisdiction to charge and prosecute individuals alleged to have engaged in criminal conduct, as defined under Minnesota Statutes. As such, the cooperative agreement is not a step-back by the state from its jurisdiction on the reservation, but more akin to an augmentation of its law enforcement powers. Therefore, retrocession of any or all of the state's criminal jurisdiction is not an issue.[7]

Affirmed.

7. We agree with the state and with amicus curiae Minnesota Chippewa Tribe's assertion that "the only jurisdiction exercised in this matter was that of the State of Minnesota," and that therefore it is unnecessary to address whether or not the Band has sovereign power to establish and enforce its own criminal code within reservation boundaries. As noted by amicus curiae Minnesota Chippewa Tribe, "Notwithstanding that exercise of [Officer Benson's] enforcement authority there was no exercise of tribal jurisdiction, so that need not be addressed to reach the conclusion that the [a]ppellant's state conviction should be affirmed."