*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A13-1430**

State of Minnesota,
Respondent,

vs.

Meng Yang,
Appellant.

**Filed December 29, 2014
Affirmed
Kirk, Judge**

Scott County District Court
File No. 70-CR-12-6857

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Patrick J. Ciliberto, Scott County Attorney, Todd P. Zettler, Assistant County Attorney, Shakopee, Minnesota (for respondent)

Craig E. Cascarano, Minneapolis, Minnesota (for appellant)

Greg S. Paulson, Kurt V. BlueDog, BlueDog, Paulson & Small, P.L.L.P., Minneapolis, Minnesota (for amicus curiae Shakopee Mdewakanton Sioux Community)

        Considered and decided by Worke, Presiding Judge; Kirk, Judge; and Reyes, Judge.

UNPUBLISHED OPINION

**KIRK**, Judge

Appellant challenges his convictions of three counts of controlled substance crime in the first degree, arguing that security guards employed by the Mystic Lake Casino Hotel violated his Fourth Amendment protections under the Indian Civil Rights Act and the United States Constitution when they conducted a warrantless search of his satchel in a hotel room and discovered methamphetamine and marijuana. Because the security guards were not acting as tribal governmental agents, appellant's rights under the Indian Civil Rights Act were not violated. We affirm.

## FACTS

The facts of this case are undisputed. On the morning of April 4, 2012, a housekeeper employed at the Mystic Lake Casino Hotel entered a guest's hotel room after receiving a request for the room to be cleaned. While making the bed, she observed a glass pipe resembling the type commonly used to smoke narcotics partially sticking out from underneath a pillow. The housekeeper alerted her supervisor, who contacted security supervisor Kyle Tutsch.

When Tutsch entered the guest's hotel room, he saw the glass pipe on the bed. Tutsch also observed a small tin canister on a desk containing numerous small baggies. One of the baggies contained a trace of a white crystal-like substance that appeared to be methamphetamine. A digital scale and several small paper scoops were located next to the canister. Tutsch contacted additional security staff, who soon arrived on the scene.

Mystic Lake Casino Hotel, which is owned by the Shakopee Mdewakanton Sioux Community, has a zero-tolerance policy for drugs, alcohol, and firearms. Guests are notified of the zero-tolerance policy on the hotel registration form that they complete during check-in and by signs posted in several areas around the casino and hotel. When a guest is found to be in possession of narcotics, security will inventory the personal belongings in the guest's hotel room and then issue an exclusion barring the guest from the casino and hotel property for 72 hours. The testimony at the suppression hearing does not indicate whether this inventory is done as part of a procedure developed by the tribe, the Mystic Lake Casino Hotel, or by the security staff to protect themselves from later claims by the excluded guest.

Tutsch, Karl Kruggel, the security shift manager, and David Janke, the director of security, inventoried the room. Kruggel searched the contents of a brown satchel and discovered three plastic bags, each containing a large amount of a white crystal-like substance that appeared to be methamphetamine, a small plastic bag containing a small amount of marijuana, and various forms of identification belonging to appellant Meng Yang. They also searched a blue duffle bag but did not find any contraband. After the inventory was complete, Janke contacted local law enforcement.

When Agent Gary Kern of the Southwest Metropolitan Drug Task Force arrived at the hotel room, all of the drugs and drug paraphernalia were laid out in plain view. Agent Kern seized the brown satchel and contraband. The security guards and Agent Kern waited inside the hotel room for appellant and S.P., the room's registered occupant, to return. Appellant and S.P. returned to the room later that morning and the security guards

3

detained them and placed them in handcuffs. The security staff served appellant with an exclusion notice. Agent Kern conducted separate interviews of appellant and S.P. Appellant denied having any knowledge of the drugs found in the brown satchel, but admitted that the satchel belonged to him and that he had observed people using methamphetamine in the hotel room the previous night. Appellant was placed into the custody of local law enforcement and respondent State of Minnesota charged him with manufacture of a controlled substance in the first degree, possession of a controlled substance in the first degree, and aiding and abetting the sale of a controlled substance in the first degree.

Appellant moved to suppress the evidence the security guards found, arguing that as a non-Indian, the Indian Civil Rights Act protected him from unreasonable searches and seizures while on Indian land, and the fruits of the search were illegally obtained. *See* 25 U.S.C. § 1302(a)(2) (2012). Appellant cited *State v. Madsen*, 760 N.W.2d 370 (S.D. 2009), for the proposition that the Indian Civil Rights Act applied to warrantless searches of a casino hotel room by the casino's security guards.

After a contested omnibus hearing, the district court denied appellant's motion, concluding that the Mystic Lake Casino Hotel security staff did not violate the Indian Civil Rights Act or the United States Constitution because hotel security considered itself to be a private entity that did not take direction from law enforcement, and it acted pursuant to its internal policy to inventory the contents of a hotel room before issuing an exclusion. The district court found no evidence of involvement by the Shakopee Mdewakanton Sioux Community or local law enforcement in the search. The jury found

4

appellant guilty on all counts, and the district court sentenced him to 175 months in prison.

Appellant now appeals his convictions.[1]

## D E C I S I O N

"When reviewing pretrial orders on motions to suppress evidence, we may independently review the facts and determine, as a matter of law, whether the district court erred in suppressing—or not suppressing—the evidence." *State v. Harris*, 590 N.W.2d 90, 98 (Minn. 1999). Whether a private citizen has acted as an agent of the government is a question of fact that must be decided on a case-by-case basis after considering all of the facts and circumstances relative to the search. *State v. Buswell*, 460 N.W.2d 614, 618 (Minn. 1990) (citing *Skinner v. United States*, 489 U.S. 602, 614, 109 S. Ct. 1402, 1411 (1989)). Such factual determinations will be reversed only if clearly erroneous. *Id.*

Both the United States and Minnesota Constitutions prohibit unreasonable searches and seizures conducted by the government. U.S. Const. amend. IV; Minn. Const. art. I, § 10. Unregistered hotel guests may have a reasonable expectation of privacy and may be protected from unreasonable searches of and seizures from their hotel room. *State v. Sletten*, 664 N.W.2d 870, 876-77 (Minn. App. 2003), *review denied* (Minn. Sept. 24, 2003). However, a private search, even if unreasonable, does not implicate Fourth Amendment protections. *Buswell*, 460 N.W.2d at 617-18.

---

[1] The Shakopee Mdewakanton Sioux Community submitted an amicus brief in support of the state's position that the security guards were not acting as government agents of the tribe.

5

The Indian Civil Rights Act embodies many of the provisions found in the United States Constitution's Bill of Rights, including the Fourth Amendment protection against unreasonable searches and seizures.[2] 25 U.S.C. § 1302(a)(2); *see Terry v. Ohio*, 392 U.S. 1, 20, 88 S. Ct. 1868, 1879 (1968); *Red Fox v. Red Fox*, 564 F.2d 361, 364 (9th Cir. 1977) (stating that the Indian Civil Rights Act "substantially tracks the precise language of the Bill of Rights portion of the [United States] Constitution").

The Fourth Amendment guarantees provided in the Indian Civil Rights Act have been extended to non-Indians while in Indian country. *See United States v. Terry*, 400 F.3d 575, 579-80 (8th Cir. 2005) (holding Indian Civil Rights Act prohibited tribal police from conducting unreasonable search and seizures of a non-Indian suspected of committing domestic violence on Indian lands). Courts have also applied the exclusionary rule to evidence obtained by Indian tribal officers in violation of section 1302(a)(2). *See People v. Ramirez*, 56 Cal. Rptr. 3d 631, 640 (Cal. Ct. App. 2007) (noting that "[t]o conclude Congress did not intend the exclusionary rule to apply to violations of section [1302(a)(2)] would be to conclude that Congress intended to sanction a new version of the 'silver platter' doctrine the [United States] Supreme Court rejected in 1960 in" *Elkins v. United States*, 364 U.S. 206, 80 S. Ct. 1437 (1960)).

The question of whether the security guards acted as agents of the tribal government, and, if so, whether the provisions of the Indian Civil Rights Act are

---

[2] 25 U.S.C. § 1302(a)(2) states, "No Indian tribe in exercising powers of self-government shall . . . violate the right of the people to be secure in their persons, houses, papers, and effects against unreasonable search and seizures, nor issue warrants, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the person or thing to be seized."

6

triggered, are questions of first impression. This court has criminal jurisdiction over this case by virtue of Public Law 280.[3] 18 U.S.C. § 1162(a) (2012); *see State v. Manypenny*, 682 N.W.2d 143, 149 (Minn. 2004) ("Public Law 280 grants the [S]tate of Minnesota broad criminal and limited civil jurisdiction over all Indian country in the state, with the exception of the Red Lake Reservation." (quotation omitted)).

When determining whether a private individual is acting on behalf of the state for Fourth Amendment purposes, Minnesota courts "stress[] two 'critical factors': (1) whether the government knew of and acquiesced in the search and (2) whether the search was conducted to assist law enforcement efforts or to further the private party's own ends." *Buswell*, 460 N.W.2d at 618 (citing *United States v. Walther*, 652 F.2d 788, 792 (9th Cir. 1981)).

Appellant urges us to adopt the reasoning and holding in *Madsen* from our sister court in South Dakota. *See* 760 N.W.2d at 379. We examine appellant's argument in light of the two-factor *Buswell* test and "watch[] for clear indices of significant government involvement which would convert the conduct of [a private security guard] into government action." 460 N.W.2d at 619.

### State v. Madsen

*Madsen* involved a set of facts that are similar in some ways and dissimilar in others to the instant case. The Royal River Casino, owned and operated by the Flandreau Santee Sioux Tribe, hired tribal members as private security guards to protect the casino

---

[3] The Shakopee Mdewakanton Sioux Community does not have its own criminal code or police force.

7

and hotel operations. *Madsen*, 760 N.W.2d at 372. Two security guards conducted a warrantless search of Madsen's hotel room after detecting a strong odor of marijuana emanating from his room. *Id.* During the search, they discovered a marijuana bud on the floor. *Id.* The security guards handcuffed and detained Madsen and contacted local law enforcement. *Id.* at 373. The security guards transferred Madsen over to police custody, and a police officer later applied for a search warrant of Madsen's hotel room and car based in part on the marijuana evidence that the security guards found. *Id.* After securing a search warrant, police discovered eight baggies of raw marijuana and drug paraphernalia in Madsen's hotel room. *Id.*

Madsen moved to suppress the evidence, arguing that the security guards acted as agents of the Flandreau Santee Sioux Tribe and failed to adhere to the provisions of the Indian Civil Rights Act, and all evidence obtained under the search warrant should be excluded as fruit of the poisonous tree. *Id.* at 374. The South Dakota Supreme Court concluded that there was sufficient evidence to support a finding that the security guards acted as agents of the tribe during their private policing of the Royal River Casino and Hotel, and the warrantless search was subject to the provisions of the Indian Civil Rights Act. *Id.* at 381.

In determining whether the security guards were acting on behalf of the Flandreau Santee Sioux Tribe, the *Madsen* court relied in part on the three-part test in *United States v. Reed*, 15 F.3d 928, 931 (9th Cir. 1994), that is largely analogous to the *Buswell* test. *Id.* at 380. The *Reed* test is: (1) whether the tribal government knew of and acquiesced in the security guards' activities; (2) whether the security guards intended to assist tribal

8

government; and (3) whether the security guards acted to further the ends of tribal government rather than their own ends. *Id.*

The *Madsen* court closely examined the tribal government's exercise of its powers of self-government through the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. §§ 2701-2721 (2012). *Id.* at 378. The IGRA, which Congress enacted in 1988, "creates a [federal] framework for regulating gaming activity on Indian Lands." *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2028 (2014); *see* 25 U.S.C. §§ 2701(5), 2703(4). Under the IGRA, the tribe is required to provide adequate security measures and personnel for its gaming operations. 25 U.S.C. § 2710(b)(2)(E)-(F). In *Madsen*, the casino had implemented policies and procedures to assist the security guards in maintaining compliance with the Flandreau Santee Sioux Gaming Commission's internal regulations, which included providing safety and security services to the tribe's hotel property.[4] 760 N.W.2d at 378. To that end, the security guards were provided with casino-issued uniforms, firearms, and handcuffs. *Id.* at 372. While on duty, the security guards followed the casino and hotel's internal policies to report unusual activity to a security captain before contacting law enforcement. *Id.* The security guards could detain suspects until law enforcement arrived. *Id.*

---

[4] While it was unclear from the record whether the Flandreau Santee Sioux Tribe operated the Royal River Casino and Hotel itself or whether it maintained an operating contract with a third party, the *Madsen* court concluded that "the casino is authorized under the Indian Gaming Regulat[ory] [Act], 25 U.S.C. § 2701(5), which permits Indian tribes to operate gaming operations under specified conditions." 760 N.W.2d at 372 n.1.

9

The *Madsen* court concluded that the security guards were tribal governmental actors by virtue of their status as employees of the tribal casino operation, which was "a distinctly [t]ribal governmental operation by virtue of the [IGRA]." *Id.* at 379. The court found that the first prong of the *Reed* test was satisfied through the Flandreau Santee Sioux Tribal Gaming Commission's knowledge of the guards' policies and procedures. *Id.* at 381. The court found that the second and third prongs of the *Reed* test were satisfied through testimony from a security guard that he conducted the warrantless search in order to protect casino and hotel property, and not for his own purposes. *Id.* For these reasons, the court held that the security guards "were [t]ribal government agents whose conduct was limited by the constraints of the Indian Civil Rights Act." *Id.*

### The Tribe's Knowledge and Acquiescence

"Mere antecedent contact between law enforcement and a private party is inadequate to trigger the application of the exclusionary remedy under the Fourth Amendment." *Buswell*, 460 N.W.2d at 619. Instead, courts look for evidence that the government took some type of initiative or steps to promote the search so that a private citizen becomes an agent or instrument of the government. *Id.*

Appellant argues by analogy to *Madsen* that the Shakopee Mdewakanton Sioux Community's extensive regulation over the security guards' behavior and conduct constitutes sufficient involvement by the tribe so as to implicate the Indian Civil Rights Act. The state argues that the Indian Civil Rights Act does not apply to for-profit tribal businesses such as Mystic Lake Casino Hotel.

10

This is a close case, but we are not persuaded by the state's argument. We acknowledge that the Shakopee Mdewakanton Sioux Community has historically played a direct role in managing and operating its gaming activities. For example, in *Gavle v. Little Six, Inc.*, the Minnesota Supreme Court recognized that the operation of Little Six, another casino owned and operated by the Shakopee Mdewakanton Sioux Community, was so inextricably intertwined with the tribe's governing structure that it was entitled to sovereign immunity from a non-Indian security guard's tort action. 555 N.W.2d 284, 295-96 (Minn. 1996).[5]

On the limited record before us, we cannot say that the district court clearly erred when it found that the security guards did not take direction from law enforcement, which we broadly infer to mean the Shakopee Mdewakanton Sioux Community tribal government and local law enforcement. There is insufficient evidence in the instant case to demonstrate that the tribe exercised a similar quantum of control through its internal policies and procedures as the tribe in *Madsen.* Had appellant proffered evidence demonstrating that the tribe developed the policies and procedures governing the security guards' conduct, our decision in this case may very well have been different.

While the Shakopee Mdewakanton Sioux Community is a federally recognized tribe that must comply with the provisions of the IGRA, there was also no evidence

---

[5] In reaching its decision, the supreme court considered a number of factors, including whether tribal officials exercised control over the administration or accounting activities of Little Six. *Gavle*, 555 N.W.2d at 294. The supreme court noted that Little Six was owned wholly by tribal members, and Little Six's articles of incorporation required that the board of directors be comprised of tribal members, some of whom were members of the tribal business council. *Id.* at 295. We note that the *Gavle* decision benefitted from a well-developed record, which is lacking in this case.

11

presented at the suppression hearing indicating that the tribe or its gaming commission did anything to encourage the security guards to conduct the searches or to search for contraband. *See id.* We note other differences between the instant case and *Madsen.* Unlike in *Madsen*, Mystic Lake Casino Hotel employs security guards who are not tribal members. The *Madsen* court also credited the police-like powers delegated to the security guards by the tribe, which included using casino-issued firearms, ammunition, and handcuffs, and detaining guests suspected of criminal conduct. 760 N.W.2d at 372, 378. Here, the security guards did not use firearms or ammunition, or wear a uniform similar to a police officer. Instead, the security staff was required to wear either a suit or a white shirt bearing a security logo and black pants. Moreover, in *Buswell*, the supreme court held that the limited power of a private security guard to make a citizen's arrest cannot be equated to the plenary police powers of a government law enforcement agent. 460 N.W.2d at 620.

The record also supports the district court's determination that Agent Kern did not know that the security guards had conducted an inventory search prior to his arrival on the scene. There is no evidence that local law enforcement encouraged or promoted the security guards to conduct a warrantless search of appellant's satchel.

**Purpose of Search**

The second prong of the *Buswell* test examines whether the purpose of the search was to advance private interests or to aid law enforcement efforts. *Id.* at 618. Appellant argues that this court should apply the reasoning of the *Madsen* court that the security guards conducted the search in order to protect the casino and hotel property, and not for

their own private purposes. Again, on the limited record before us, we cannot say that the district court clearly erred in determining that there was a legitimate private purpose for the search. *See id.* at 620 (concluding that the district court's finding that private security guards had private, legitimate reasons for searching cars seeking to enter international raceway, which included preventing injury or discomfort of other patrons and to reduce possibility of destruction to property was not clearly erroneous).

The record developed at the suppression hearing is unclear as to whether Mystic Lake Casino Hotel had a private interest in lowering its risk of civil liability arising from a claim of theft by a hotel guest who was excluded from the property. The *Madsen* court concluded that the security guards acted to further the ends of the tribal government through the security guard's testimony that he conducted the search not for his own purposes, but to protect casino and hotel property. 760 N.W.2d at 381. In contrast, when the prosecutor asked Tutsch why he inventoried the hotel room, he replied, "So guests don't come back later and, you know, say *we* may have taken an item of theirs that was up in the room." (Emphasis added.) It is unclear from Tutsch's testimony whether he was referring to the personal interest of the security guards to avoid an allegation of theft, or whether he meant that he acted on behalf of Mystic Lake Casino Hotel.

It is clear that housekeeping staff and security staff observed the glass pipe and drug paraphernalia in plain view. Had there been evidence showing the guards acted under the directive of the tribal government, the ensuing inventory search of the hotel room may have violated the Indian Civil Rights Act warranting suppression of the evidence. *See Buswell*, 460 N.W.2d at 617. But on the limited record before us, we are

13

bound to uphold the district court's determination.  We conclude that the district court did not err when it found the search of appellant's satchel was private and did not offend the Indian Civil Rights Act.

**Affirmed.**