[No. C048138. Third Dist. Mar. 28, 2007.]

THE PEOPLE, Plaintiff and Appellant, v.
GILBERT RAMIREZ, Defendant and Respondent.

## COUNSEL

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Mary Jo Graves, Assistant Attorney General, John G. McLean and George M. Hendrickson, Deputy Attorneys General, for Plaintiff and Appellant.

No appearance for Defendant and Respondent.

George Bond and Elizabeth Campbell for Central California Appellate Program as Amicus Curiae on behalf of Defendant and Respondent.

**OPINION**

**ROBIE, J.**—Since the Seminole Tribe of Florida opened its first bingo hall in 1979 and succeeded in blocking legal challenges to the hall's operation,[1] the Indian gaming industry has seen a meteoric rise in popularity and profitability. According to data from the National Indian Gaming Commission, revenues from Indian gaming nationwide rose from about $5.4 billion in 1995 to about $19.4 billion in 2004.[2]

Unquestionably, these figures reflect a substantial increase in the number of non-Indians entering and engaging in activities on Indian land. This ever-increasing influx of people onto reservations and rancherias throughout the country[3] is probably nowhere more prevalent than in California, where, at the end of 2006, 54 tribes were conducting gaming operations in 56 locations across the state.[4]

Unfortunately, more people on Indian land means a greater potential for crime on Indian land, which raises interesting and difficult questions about the role of—and limitations on—tribal police officers involved in investigating suspected criminal activities and the use of evidence obtained by those officers. This case raises one such question, namely, whether the exclusionary rule applies in a state criminal prosecution to evidence obtained as the result of an unreasonable search conducted by Indian law enforcement officers on Indian land.

Here, two tribal police officers who suspected possible narcotics activity in the parking garage of an Indian casino searched a car without probable cause and found drugs and drug paraphernalia. Charged in Amador County Superior Court with possession of drugs for sale, defendant Gilbert Ramirez succeeded in having the evidence suppressed and the case dismissed.

On appeal, the People contend the trial court erred in suppressing the evidence because tribal police officers are not bound by the Fourth

---

[1] See *Seminole Tribe of Florida v. Butterworth* (S.D.Fla. 1980) 491 F.Supp. 1015, affirmed (5th Cir. 1981) 658 F.2d 310, certiorari denied *sub nomine Butterworth v. Seminole Tribe of Florida* (1982) 455 U.S. 1020 [72 L.Ed.2d 138, 102 S.Ct. 1717]; Senate Report No. 100-446, Second Session, pages 1–2 (1988).

[2] <http://www.nigc.gov/TribalData/GrowthinIndianGamingGraph19952004/tabid/114/Default.aspx> (as of Mar. 28, 2007).

[3] A "Gaming Tribes Listing" from the National Indian Gaming Commission, sorted by state, reflects Indian gaming operations in 28 states as of December 28, 2006. (<http://www.nigc.gov/TribalData/GamingTribesListing/tabid/68/Default.aspx> [as of Mar. 28, 2007].)

[4] See <http://www.nigc.gov/TribalData/GamingTribesListing/tabid/68/Default.aspx> (as of Mar. 28, 2007).

Amendment and therefore the exclusionary rule does not apply. The People further argue that subdivision (d) of article 1, section 28 of the California Constitution—the "Right to Truth-in-Evidence" provision (hereafter section 28(d))—required the trial court to admit the evidence at trial in the absence of a federal constitutional basis for suppression.

We find no error. As will be seen, section 1302(2) of the Indian Civil Rights Act of 1968 (25 U.S.C. § 1302(2), hereafter section 1302(2)) prohibits unreasonable searches and seizures by tribal police officers just like the Fourth and Fourteenth Amendments prohibit unreasonable searches and seizures by federal and state law enforcement officers. Given that the purpose of the Indian Civil Rights Act was to impose on Indian governments the same restrictions applicable to the federal and state governments under the federal Constitution, we find no principled basis for concluding that evidence obtained in violation of the Fourth Amendment must be suppressed, but evidence obtained in violation of the same proscription against unreasonable searches and seizures in section 1302(2) can be used. Furthermore, we conclude that under the supremacy clause of the federal Constitution, section 28(d) cannot require the admission of evidence that is subject to an exclusionary rule imposed by federal law. Accordingly, we will affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

The Jackson Rancheria Band of Miwuk Indians is a federally recognized Indian tribe that conducts Indian gaming operations under a compact with the State of California.[5] (See Gov. Code, § 12012.5, subd. (a)(4).) The tribe also operates its own police force, the Jackson Rancheria Tribal Police Department.

As two uniformed officers of the tribal police patrolled a parking garage at the tribe's casino in November 2003, they spotted defendant sitting in the passenger seat of a parked car, "digging through the center [console]." They also noticed a woman in the driver's seat "nervously . . . looking around front, back, [and] side to side." With little further ado, the officers searched the car. They found narcotics and related paraphernalia. The officers then summoned the Amador County Sheriff's Department.[6]

Defendant was charged by information in Amador County Superior Court with possession of heroin, methamphetamine, and marijuana for sale. Before

---

[5] The Bureau of Indian Affairs identifies the tribe as the "Jackson Rancheria of Me-Wuk Indians of California." (See Indian Entities Recognized and Eligible To Receive Services From the United States Bureau of Indian Affairs (70 Fed.Reg. 71194–71195 (Nov. 25, 2005)).)

[6] Because the People do not challenge the trial court's conclusion that the tribal officers lacked probable cause to search, the other facts surrounding the search are irrelevant.

trial, defendant moved to suppress all of the evidence obtained as a result of the search by the tribal officers. In response, in addition to arguing the search was proper, the prosecutor argued the exclusionary rule did not apply because the Fourth Amendment did not govern the tribal officers' search. The prosecutor further argued that because the federal Constitution did not mandate exclusion of the evidence, the court had to admit it under section 28(d).

The trial court, however, analyzed the lawfulness of the search under section 1302(2) of the Indian Civil Rights Act. The court concluded it "would be a complete denial of due process" not to apply that statute to the actions of the tribal officers in the same manner the Fourth Amendment is applied to the actions of state law enforcement officers (through the Fourteenth Amendment) because the statute "mimic[s] practically word-for-word the language of the [Fourth] Amendment." Accordingly, after concluding the officers lacked probable cause to search, the court granted defendant's motion to suppress.

Thereafter, the prosecutor filed a statement of "insufficient evidence to proceed to trial," and the trial court dismissed the case. The People appealed. After defendant failed to file a respondent's brief, this court invited the Central California Appellate Program to file an amicus curiae brief, and it accepted the invitation.

## DISCUSSION

The People argue the exclusionary rule does not apply here because tribal police officers are not bound by the Fourth Amendment. They further assert that section 28(d) required the trial court to admit the evidence. We reject these arguments.

■ The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated . . . ." (U.S. Const., 4th Amend.) This guarantee is "basic to a free society" and "is therefore implicit in 'the concept of ordered liberty' and as such enforceable against the States through the Due Process Clause" of the Fourteenth Amendment. (*Wolf v. Colorado* (1949) 338 U.S. 25, 27–28 [93 L.Ed. 1782, 1785, 69 S.Ct. 1359], overruled on other grounds in *Mapp v. Ohio* (1961) 367 U.S. 643 [6 L.Ed.2d 1081, 81 S.Ct. 1684].) Moreover, "the standard of reasonableness is the same under the Fourth and Fourteenth Amendments." (*Ker v. California* (1963) 374 U.S. 23, 33 [10 L.Ed.2d 726, 738, 83 S.Ct. 1623].)

■ Generally, "The provisions of the Constitution of the United States have no application to Indian nations or their governments . . . ."

*(Groundhog v. Keeler* (10th Cir. 1971) 442 F.2d 674, 681.) "As separate sovereigns pre-existing the Constitution, tribes have historically been regarded as unconstrained by those constitutional provisions framed specifically as limitations on federal or state authority." *(Santa Clara Pueblo v. Martinez* (1978) 436 U.S. 49, 56 [56 L.Ed.2d 106, 113–114, 98 S.Ct. 1670].)

An exception to this rule exists, however, when the provisions of the Constitution "are made applicable [to Indian nations] by an Act of Congress." *(Groundhog v. Keeler, supra,* 442 F.2d at p. 681.) "The Constitution is, of course, the supreme law of the land, but it is nonetheless a part of the laws of the United States. Under the philosophy of the decisions, it, as any other law, is binding upon Indian nations only where it expressly binds them, or is made binding by treaty or some act of Congress." *(Native American Church v. Navajo Tribal Council* (10th Cir. 1959) 272 F.2d 131, 134–135.)

■ Section 1302 of the Indian Civil Rights Act is one such act of Congress. That statute provides in relevant part as follows: "No Indian tribe in exercising powers of self-government shall—[¶] . . . [¶] (2) violate the right of the people to be secure in their persons, houses, papers, and effects against unreasonable search and seizures . . . ." (25 U.S.C. § 1302.) This language is, for all intents and purposes, identical to the language of the Fourth Amendment (see above)[7] and thus evidences a congressional intent to extend, as against the Indian tribes, "[t]he security of one's privacy against arbitrary intrusion by the police—which is at the core of the Fourth Amendment." *(Wolf v. Colorado, supra,* 338 U.S. at p. 27 [93 L.Ed. at p. 1785].)

This intent is confirmed by the legislative history of the Indian Civil Rights Act. "[A] central purpose of the [Indian Civil Rights Act] . . . was to 'secur[e] for the American Indian the broad constitutional rights afforded to other Americans,' and thereby to 'protect individual Indians from arbitrary and unjust actions of tribal governments.' " *(Santa Clara Pueblo v. Martinez, supra,* 436 U.S. at p. 61 [56 L.Ed.2d at p. 117], quoting Sen.Rep. No. 841, 90th Cong., 1st Sess., pp. 5–6 (1967); see generally Burnett, *An Historical Analysis of the 1968 "Indian Civil Rights" Act* (1972) 9 Harv.J. on Legis. 557.) As the Tenth Circuit Court of Appeals explained in *Groundhog v. Keeler, supra,* 442 F.2d at pages 681–682:

"The original bill to provide an Indian Bill of Rights, considered by the Senate Subcommittee, was brief and badly worded. It read as follows:

---

[7] The only differences are: (1) a comma after the word "papers" in the statute; and (2) the use of the word "search" in the statute versus the word "searches" in the Fourth Amendment.

" '* * * any Indian tribe, in exercising its powers of local self-government shall be subject to the same limitations and restraints as those which are imposed on the Government of the United States by the United States Constitution.'

"There were many objections to the broad language of the bill at the hearing, particularly as to the Fifteenth Amendment restraints embraced in the original bill.

"The Department of the Interior submitted a substitute bill, which, with minor revisions, was introduced in the 90th Congress and eventually enacted into law as the present Indian Bill of Rights.

"In its endorsement of the substitute bill, the summary of the report of the Senate Subcommittee on the Judiciary stated:

" 'The Department of Interior's bill would, in effect, *impose upon the Indian governments the same restrictions applicable presently to the Federal and State governments* with several notable exceptions, viz., the 15th amendment, certain of the procedural requirements of the 5th, 6th, and 7th amendments, and, in some respects, the equal protection requirement of the 14th amendment.'

"The summary of the report of the Subcommittee was endorsed and adopted by the Senate Committee on the Judiciary." (Italics added.)

■ Thus, by act of Congress, Indian tribal governments have no more power to conduct unreasonable searches and seizures than do the federal and state governments under the Fourth Amendment.[8] The question is whether in extending the Fourth Amendment's prohibition against unreasonable searches and seizures to Indian tribal governments through its enactment of section 1302(2), Congress also intended that the exclusionary rule which unquestionably applies to evidence obtained by federal and state law enforcement officers in violation of the Fourth and Fourteenth Amendments would likewise apply to evidence seized by tribal police officers in violation of section 1302(2).

This question is one of first impression in California. Some lower federal courts have touched on the issue in cases involving federal criminal prosecutions, but those decisions are of little value to us because the courts generally have *assumed* the exclusionary rule applies if tribal law enforcement officers

---

[8] For this reason, we reject the People's argument that "with respect to non-Indians, tribal officers have essentially the same status as security guards who patrol their employers' premises."

violated the prohibition against unreasonable searches and seizures in the Indian Civil Rights Act; they have not actually *decided* whether the rule applies. (E.g., *U.S. v. Becerra-Garcia* (9th Cir. 2005) 397 F.3d 1167, 1171 and cases cited therein.)

The decision of the Eighth Circuit Court of Appeals in *United States v. Lester* (8th Cir. 1981) 647 F.2d 869 is an exception; however, the *Lester* court gave the question of whether the exclusionary rule applies sparse consideration, noting only as follows: "The language of the Indian Civil Rights Act parallels the fourth amendment guarantee to 'the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" . . . The Act purports to give 'Indians constitutional rights which other Americans enjoy.' [Citation.] In light of the legislative history of the Indian Civil Rights Act and its striking similarity to the language of the Constitution, [citation], we consider the problem before us under fourth amendment standards." (*Id.* at p. 872.)

It is significant to note the *Lester* court went on to conclude the search and seizure in that case were reasonable under Fourth Amendment standards and thus there was no basis to suppress the evidence. (*United States v. Lester, supra*, 647 F.2d at p. 874.) Indeed, no appellate court of which we are aware has ever affirmed the exclusion of evidence because it was obtained in violation of section 1302(2). Since we are called on to do that very thing here, we believe the question whether Congress intended the exclusionary rule to apply to evidence obtained in violation of section 1302(2) warrants a more thorough examination than that provided by the federal courts to date.

■ The People point out that the Indian Civil Rights Act "contains no exclusionary rule." Although Congress has, on at least one occasion, expressly included an exclusionary rule in a statute (see 18 U.S.C. § 2515 [part of the Omnibus Crime Control and Safe Streets Act of 1968; hereafter the federal wiretapping statute]), its failure to do so in the Indian Civil Rights Act is of little significance because "Congress is understood to legislate against a background of common-law . . . principles. [Citations.] Thus, where a common-law principle is well established, . . . the courts may take it as given that Congress has legislated with an expectation that the principle will apply except 'when a statutory purpose to the contrary is evident.' " (*Astoria Federal S. & L. Assn. v. Solimino* (1991) 501 U.S. 104, 108 [115 L.Ed.2d 96, 104, 111 S.Ct. 2166].) "In such cases, Congress does not write upon a clean slate." (*United States v. Texas* (1993) 507 U.S. 529, 534 [123 L.Ed.2d 245, 252, 113 S.Ct. 1631].)

The exclusionary rule has been a part of Fourth Amendment search and seizure jurisprudence for nearly a century. In 1914, the United States

Supreme Court announced the basic rule: Evidence obtained by federal officers in violation of the Fourth Amendment must be excluded on proper objection in a federal criminal prosecution. (*Weeks v. United States* (1914). 232 U.S. 383, 398 [58 L.Ed. 652, 34 S.Ct. 341, 656].) In 1949, the Supreme Court determined the Fourth Amendment's prohibition against unreasonable searches and seizures was applicable to the states through the due process clause of the Fourteenth Amendment, but the court refused to extend the exclusionary rule to the states at that time. (*Wolf v. Colorado, supra,* 338 U.S. at pp. 27–28, 33 [93 L.Ed. at pp. 1785–1786].) In 1960, the court expanded the exclusionary rule to prohibit the use in federal courts of evidence illegally seized by state agents, thus putting an end to what had been known as the "silver platter" doctrine. (*Elkins v. United States* (1960) 364 U.S. 206 [4 L.Ed.2d 1669, 80 S.Ct. 1437].) Finally, in 1961 the Supreme Court partially overruled *Wolf* and extended the exclusionary rule to cover evidence obtained by state officers used in state criminal prosecutions. (*Mapp v. Ohio, supra,* 367 U.S. at pp. 655–656 [6 L.Ed.2d at p. 1090].)

"[T]he precise constitutional status" of this rule has been a subject of "intense debate." (1 LaFave, Search and Seizure (4th ed. 2004) § 1.1(f), p. 24.) "In *Mapp*, the exclusionary rule was declared to be 'part and parcel of the Fourth Amendment's limitation upon [governmental] encroachment of individual privacy' and 'an essential part of both the Fourth and Fourteenth Amendments.' " (*Ibid.*) Twelve years later, however, in *Calandra*, the court described the rule as a "judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." (*United States v. Calandra* (1974) 414 U.S. 338, 348 [38 L.Ed.2d 561, 571, 94 S.Ct. 613].) The court went even further in *United States v. Leon* (1984) 468 U.S. 897 [82 L.Ed.2d 677, 104 S.Ct. 3405], reiterating its characterization of the exclusionary rule as a judicially created remedy but also specifically rejecting any implication from *Mapp* "that the exclusionary rule is a necessary corollary of the Fourth Amendment." (*Leon,* at p. 906 [82 L.Ed.2d at p. 687].)

Whatever "the precise constitutional status" of the exclusionary rule may be, for our purposes it is most significant that when Congress enacted the Indian Civil Rights Act in 1968, the Supreme Court had not yet retreated from its assertions in *Mapp* that the exclusionary rule was an "essential part" of the Fourth and Fourteenth Amendments. Because Congress acted against this background, we take it as given that Congress expected this well-established common law principle—the exclusionary rule—to be as much a part of the prohibition against unreasonable searches and seizures in section 1302(2) as it was then considered a part of the identical prohibition in the federal Constitution.

Of course, this presumption in favor of the rule's application to violations of section 1302(2) could be overcome by evidence of congressional intent to the contrary; however, we are aware of no such evidence. Certainly nothing in the legislative history evidences any intent to abrogate the well-established exclusionary rule or suggests Congress intended to allow tribal police officers to operate free from the deterrent effects of the rule. On the contrary, as we have noted, the legislative history of the Indian Civil Rights Act supports the conclusion that in extending the prohibition against unreasonable searches and seizures to Indian tribal governments, Congress intended to subject those governments to the same restrictions understood to be applicable to the federal and state governments at that time. This intent cannot be achieved unless the exclusionary rule applies to unreasonable searches and seizures by tribal police officers in the same manner it applies to unreasonable searches and seizures by agents of the federal and state governments.

Even as it has backed away from *Mapp*'s characterization of the exclusionary rule as an essential part of the Fourth and Fourteenth Amendments, the United States Supreme Court has adhered to the exclusionary rule itself "in the hope that the frequency of future violations [of the prohibition against unreasonable searches and seizures] will decrease." (*Stone v. Powell* (1976) 428 U.S. 465, 492 [49 L.Ed.2d 1067, 1086, 96 S.Ct. 3037].) "Despite the absence of supportive empirical evidence, we have assumed that the immediate effect of exclusion will be to discourage law enforcement officials from violating the Fourth Amendment by removing the incentive to disregard it. More importantly, over the long term, this demonstration that our society attaches serious consequences to violation of constitutional rights is thought to encourage those who formulate law enforcement policies, and the officers who implement them, to incorporate Fourth Amendment ideals into their value system." (*Ibid.* [49 L.Ed.2d at pp. 1086–1087], fns. omitted.) As the court stated even before *Mapp*, "The rule is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty [against unreasonable searches and seizures] in the only effectively available way—by removing the incentive to disregard it." (*Elkins v. United States, supra,* 364 U.S. at p. 217 [4 L.Ed.2d at p. 1677].)

We are offered no reason to believe Congress assessed the presumed deterrent effect of the exclusionary rule differently when it incorporated the basic prohibition of the Fourth Amendment against unreasonable searches and seizures into the Indian Civil Rights Act. Indian tribes depend largely on the federal and/or state governments to prosecute crimes committed on Indian land.[9] Thus, the tribes have as much interest (if not more) in the success of

---

[9] The states have exclusive criminal jurisdiction over crimes committed on Indian land between non-Indians, as well as victimless crimes committed by non-Indians. (See *United States v. McBratney* (1882) 104 U.S. 621 [26 L.Ed. 869] [state versus federal jurisdiction];

those prosecutions as the federal and/or state governments do, and application of the exclusionary rule as a remedy for violation of section 1302(2) can be expected to have as much of a deterrent effect as it has on federal and state agents whose actions are subject to the Fourth and Fourteenth Amendments.

To conclude Congress did not intend the exclusionary rule to apply to violations of section 1302(2) would be to conclude that Congress intended to sanction a new version of the "silver platter" doctrine the Supreme Court rejected in 1960 in *Elkins*. If application of the exclusionary rule was not implied in Congress's enactment of section 1302(2), tribal police officers could violate the statute with virtual impunity and simply hand over the evidence to the federal and state prosecutors on whom the tribes largely depend to enforce the criminal law on tribal land. Such a result could hardly be expected to compel respect for section 1302(2) and would undoubtedly serve to defeat Congress's intent to secure for Indians the right against unreasonable searches and seizures afforded to other Americans.

■ For the foregoing reasons, we conclude Congress intended courts, both state and federal, to apply to evidence seized by tribal police officers in violation of section 1302(2) the same exclusionary rule that applies to evidence obtained by federal and state law enforcement officers in violation of the Fourth and Fourteenth Amendments.

■ The People contend "Congress has no general power to compel state action, such as the exclusion of evidence." Thus, in the People's view, even if Congress intended the exclusionary rule to apply to violations of section 1302(2) by tribal police officers, Congress has no power to compel *state* courts (as opposed to federal courts) to apply that rule. We disagree. It is an

---

*Oliphant v. Suquamish Indian Tribe* (1978) 435 U.S. 191 [55 L.Ed.2d 209, 98 S.Ct. 1011] [tribal courts have no inherent criminal jurisdiction over non-Indians]; *Solem v. Bartlett* (1984) 465 U.S. 463, 465 [79 L.Ed.2d 443, 447, fn. 2, 104 S.Ct. 1161] [note regarding victimless crimes].) In addition, some states, including California, have assumed exclusive jurisdiction over crimes committed by or against Indians on Indian land. (18 U.S.C. § 1162.) In other states, criminal jurisdiction over crimes by or against Indians rests largely with the federal government under the Indian General Crimes Act (18 U.S.C. § 1152) and the Federal Major Crimes Act (18 U.S.C. § 1153(a)). (See Note, *A New Limitation on Indian Tribal Sovereignty: No Criminal Jurisdiction Over Nonmember Indians* (1991) 15 S. Ill. U. L.J. 623, 626–628.) Minor offenses committed by one Indian against another may be prosecuted in tribal court under the Indian General Crimes Act; however, the maximum penalty a tribal court can impose is a fine of $5,000 or six months imprisonment, or both. (See Note, *supra*, at pp. 628–629, citing 25 U.S.C. § 1302(7).)

"undisputed fact that Congress has plenary authority to legislate for the Indian tribes in all matters." (*United States v. Wheeler* (1978) 435 U.S. 313, 319 [55 L.Ed.2d 303, 310, 98 S.Ct. 1079].) This power "derives from federal responsibility for regulating commerce with Indian tribes and for treaty making." (*McClanahan v. Arizona State Tax Comm'n* (1973) 411 U.S. 164, 172 [36 L.Ed.2d 129, 135, fn. 7, 93 S.Ct. 1257]; see U.S. Const., art. I, § 8, cl. 3 & art. II, § 2, cl. 2.) If—as is undisputed here—Congress has the power to prohibit Indian tribes from conducting unreasonable searches and seizures, Congress certainly has the power to provide for effective enforcement of that prohibition through application of the exclusionary rule in all forums where evidence obtained in violation of that prohibition may be offered, including state courts.

Relying on section 28(d),[10] the People assert the trial court was required to admit the evidence at issue here because under that provision evidence can be excluded in a California criminal prosecution (with certain exceptions not applicable here) only if exclusion is required by the federal *Constitution*. (See *In re Tyrell J.* (1994) 8 Cal.4th 68, 76 [32 Cal.Rptr.2d 33, 876 P.2d 519].) They acknowledge state courts must comply with the exclusionary rule in the federal wiretapping statute (see *People v. Otto* (1992) 2 Cal.4th 1088, 1098 [9 Cal.Rptr.2d 596, 831 P.2d 1178]) but they contend this is so only because that statute contains an express exclusionary rule. In the People's view, "[s]ince the federal wiretapping statute clearly relied on the Supremacy Clause, which is part of the federal Constitution, exclusion [pursuant to that statute] could be found to be 'required by the federal Constitution.' "[11] They contend a different result applies to section 1302(2) because that statute "does not expressly or impliedly require any action by the states."

We have concluded already that Congress intended the exclusionary rule to apply, in both federal and state courts, to evidence seized in violation of the prohibition against unreasonable searches and seizures in section 1302(2). Thus, the premise for the People's argument fails. It is elementary that under the supremacy clause, a state law that conflicts with federal law is without effect. (*Olszewski v. Scripps Health* (2003) 30 Cal.4th 798, 814 [135 Cal.Rptr.2d 1, 69 P.3d 927].) Accordingly, section 28(d)'s requirement that

---

[10] In relevant part, section 28(d) provides, "relevant evidence shall not be excluded in any criminal proceeding." This provision was added to our Constitution by the electorate in June 1982. (Historical Notes, 1C West's Ann. Cal. Const. (2002 ed.) foll. art. 1, § 28, p. 377.)

[11] "Clause 2 of article VI of the United States Constitution—the supremacy clause—declares that 'Laws of the United States . . . shall be the supreme Law of the Land; and the judges in every state shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.' " (*Peatros v. Bank of America* (2000) 22 Cal.4th 147, 157 [91 Cal.Rptr.2d 659, 990 P.2d 539].)

relevant evidence shall not be excluded could not require the admission of the evidence at issue here, which the trial court was bound to exclude by force of federal law.

## DISPOSITION

The judgment is affirmed.

Morrison, Acting P. J., and Hull, J., concurred.

Appellant's petition for review by the Supreme Court was denied July 18, 2007, S152508.