#24654-rev & rem-DG

**2009 SD 5**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,                          Plaintiff and Appellee,

v.

HARRY L. MADSEN,                          Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
MOODY COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE DAVID R. GIENAPP
Judge

\* \* \* \*

LAWRENCE E. LONG
Attorney General

ANN C. MEYER
Assistant Attorney General
Pierre, South Dakota                          Attorneys for plaintiff
                                              and appellee.


JACK DER HAGOPIAN
Sioux Falls, South Dakota                     Attorney for defendant
                                              and appellant.

\* \* \* \*

ARGUED SEPTEMBER 30, 2008

OPINION FILED **01/21/09**

#24654

GILBERTSON, Chief Justice

[¶1.] Defendant was arrested and convicted for drug-related crimes using evidence seized by security guards at a hotel owned and operated by the Flandreau Santee Sioux Tribe. Defendant claimed the search violated either the Indian Civil Rights Act, or the Fourth Amendment, and that the evidence seized should be suppressed. The circuit court denied Defendant's motion to suppress the evidence. We reverse and remand.

## FACTS

[¶2.] On January 12, 2007, the Defendant Harry L. Madsen (Madsen) rented a hotel suite at the Royal River Casino and Hotel in Flandreau, South Dakota. Madsen invited friends to his room including Benjamin Carter (Carter) and Matthew Leiss. The two friends were not registered guests of the hotel, did not have a key to the room, and were not staying overnight in the room.

[¶3.] The Royal River Casino Hotel is owned and operated by the Flandreau Santee Sioux Tribe.[1] The tribe hires tribal members as security guards for the protection of casino and hotel assets, and watch for any unlawful activity or unruly behavior. Security guards carry company-owned and issued firearms, ammunition, and handcuffs while on duty, and follow the casino and hotel's internal procedures for reporting unusual situations to a security captain before summoning local law

---

1. It is unclear from the record whether the Tribe itself operates the casino and hotel, or whether it maintains an operating contract with a third party. However, whether operated directly by the Tribe or by a third party on behalf of the Tribe, the casino is authorized under the Indian Gaming Regulation, 25 USC § 2701(5), which permits Indian tribes to operate gaming operations under specified conditions.

enforcement for criminal matters. Security guards do not have authority to conduct an arrest on tribal property, only to detain suspected violators until law enforcement arrives.

[¶4.] Shortly after midnight on January 13, 2007, security captain Robert Long Crow (Long Crow) received a report from two security guards who had been escorting a guest back to a room on the third floor. The security guards reported they could smell a "very strong odor of marijuana" emanating from a room on the third floor, which was subsequently identified as Madsen's suite. Long Crow, wearing his casino-issued uniform and firearm, exited the elevator on the third floor and detected a strong odor of raw marijuana. He could also hear male voices and the loud noise of a television coming from the suite. Long Crow approached the suite, stuck his nose up against the door, and determined that Madsen's suite was the source of the odor.

[¶5.] Long Crow, now in the company of two other security guards, placed his finger over the peephole and knocked on the door. Long Crow intended to gain access to the room first by ruse, and if entry was not permitted he intended to use a master key and a crash bar to open the door by force. Benjamin Carter (Carter) opened the door four or five inches and Long Crow told him of a non-existent noise complaint as a ruse to get Carter to open the door. Carter denied Long Crow entry and attempted to close the door. Long Crow had placed his foot over the threshold while speaking with Carter, and pushed the door back toward Carter. Carter then said "go ahead and come on in," and Long Crow and one of the security guards entered the living room of the hotel suite. The security guard made a sweep of the

living room, while Long Crow walked toward what he thought at the time was a syringe but turned out to be a small screwdriver. During the security sweep, one of the guards discovered a marijuana bud the size of a quarter on the carpet next to a coffee table. The security guards did not search the bedroom or the bathroom, as the doors to these rooms were closed.

[¶6.] Long Crow and the security guards placed all three men in casino issued handcuffs and led them to the hotel lobby to await the arrival of local law enforcement. All three men denied being the registered guest during this time. Each claimed that they were a friend of the hotel guest and had intended to stay for a few hours before leaving.

[¶7.] Mike Eisenbarth (Eisenbarth) of the City of Flandreau Police Department arrived at the hotel lobby, and was informed of the circumstances of the detention. Eisenbarth was shown the marijuana bud. Eisenbarth then searched the three men before transferring them from the casino's handcuffs to police department handcuffs. While searching Madsen's pockets, Eisenbarth discovered six nine-millimeter pistol rounds and $2,500.00 in cash. Eisenbarth also obtained the driver's licenses of the three men and eventually was able to determine Madsen's identity and that the hotel suite was registered to Madsen.

[¶8.] Eisenbarth then filed an affidavit with the circuit court along with a request for a warrant to search Madsen's hotel suite and car. In the affidavit, Eisenbarth recounted Long Crow's report on the search of the room, stated his opinion that the item found by Long Crow and his staff was a marijuana bud, and recounted Eisenbarth's discovery of the cash and ammunition on Madsen. After a

warrant issued, Eisenbarth searched Madsen's suite and discovered a bag that contained eight baggies of raw marijuana, two packets of methamphetamine, one spoon, four knives, and a Chinese throwing star. A search of Madsen's car revealed some hypodermic needles, a container of a suspicious white substance, and a bottle of pills without a prescription label. A urine sample collected from Madsen tested positive for cocaine, methamphetamine, and marijuana.

[¶9.]     Madsen's pretrial motion to suppress all evidence collected by Eisenbarth was denied by the circuit court. Madsen's renewed motion to suppress was also denied. The circuit court found that the Indian Civil Rights Act applied to the matter, as the incident occurred in Indian country. The circuit court also found that the Royal River Casino and Hotel were owned by the Tribe, and operated either by the Tribe or under a third-party management contract. The circuit court then found that Long Crow and his security guards were acting as private citizens rather than as agents of the State or the Tribe when they conducted the search of Madsen's hotel suite. Finally, the circuit court concluded that the prohibition against unreasonable searches and seizures did not apply to Long Crow and his security guards given their status as private citizens. The circuit court did not make any findings concerning whether Carter was authorized to and willingly gave consent to the search of Madsen's hotel suite.

[¶10.]     After a bench trial on the matter, Madsen was sentenced to two, concurrent, six-year sentences for possession of controlled substances (methamphetamine and cocaine); a three-year sentence for intent to distribute marijuana to be served consecutive to the controlled substance counts; a suspended

-4-

thirty-day jail sentence for possession of marijuana; and a second suspended thirty-day jail sentence for ingesting substances. Madsen raises two issues on appeal:

1. Whether the circuit court erred by denying Madsen's motion to suppress and motion to reconsider based on its conclusion of law that the hotel security guards were not working as agents of State or Tribal law enforcement.

2. Whether the circuit court erred by not considering Madsen's motion to suppress and motion to reconsider based on Carter's inability to consent to a search of the hotel suite.

## STANDARD OF REVIEW

[¶11.] A warrantless search conducted by the government, its officials and agents implicates a defendant's Fourth Amendment right. State v. Bowker, 2008 SD 61, ¶17, 754 NW2d 56, 62 (citing State v. Sweedland, 2006 SD 77, ¶¶12-13, 721 NW2d 409, 412). "The constitutional provisions prohibiting unreasonable searches and seizures only protect against action by the government, its officials and agents, and have no application to the wrongful or unauthorized acts of private individuals." State v. Cundy, 86 SD 766, 771, 201 NW2d 236, 239 (1972) (citing 79 CJS Searches and Seizures § 5c, p783). "This Court reviews the denial of a motion to suppress alleging a violation of a constitutionally protected right as a question of law by applying the de novo standard." Bowker, 2008 SD 61, ¶17, 754 NW2d at 62 (citing State v. Stanga, 2000 SD 129, ¶8, 617 NW2d 486, 488 (citing Ornelas v. United States, 517 US 690, 699, 116 SCt 1657, 1663, 134 LEd2d 911 (1996); United States v. Khan, 993 F2d 1368, 1375 (9thCir 1993); State v. Hirning, 1999 SD 53, ¶9, 592 NW2d 600, 603)). However, the clearly erroneous standard is applied to the circuit court's findings of fact. Id.

## ANALYSIS AND DECISION

[¶12.]     1.     **Whether the circuit court erred by denying Madsen's motion to suppress and motion to reconsider based on its conclusion of law that the hotel security guards were not working as agents of State or Tribal law enforcement.**

[¶13.]     Madsen argued below that the hotel security guards were agents of the Tribe and in that capacity were required to adhere to Fourth Amendment principles by virtue of the Indian Civil Rights Act, 25 USC § 1302(2). Madsen contended that violations of the reasonableness requirement in the Indian Civil Rights Act by hotel security guards required suppression of the marijuana bud seized in the hotel suite at the time of the original search. Madsen further contended all evidence subsequently discovered in the safety search of his person and under the search warrant obtained after the discovery of the marijuana bud was fruit of the poisonous tree and should have been excluded under *Wong Sun v. United States*, 371 US 471, 83 SCt 407, 9 LEd2d 441 (1963). In the alternative, Madsen argued that the hotel security guards were acting as agents of the City of Flandreau Police Department, and thus their actions were limited by the constraints of the Fourth Amendment.

[¶14.]     The circuit court found that the Indian Civil Rights Act, 25 USC § 1302(2) applied, and that it provided protections similar to the Fourth Amendment. However, the circuit court found that the prohibition on unreasonable searches and seizures contained in the Indian Civil Rights Act did not apply to Long Crow and the security guards, as they were acting as private citizens at the time of the search.

*The Indian Civil Rights Act and the Fourth Amendment*

[¶15.]     The Indian Civil Rights Act provides in relevant part:

> No Indian tribe in exercising powers of self-government shall--
>
> . . .
>
> **(2)** violate the right of the people to be secure in their persons, houses, papers, and effects against unreasonable search and seizures, nor issue warrants, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the person or thing to be seized[.]

25 USC § 1302(2).

[¶16.]     The text of the Indian Civil Rights Act is remarkably similar to the text of the Fourth Amendment, which provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

US Const. amend. IV.  The Fourth Amendment prohibition against unreasonable searches and seizures is applicable to the states through the Fourteenth Amendment.  State v. McCreary, 82 SD 111, 124-25, 142 NW2d 240, 247 (1966) (quoting Mapp v. Ohio, 367 US 643, 81 SCt 1684, 6 LEd2d 1081 (1961)).  The constitutional prohibition against unreasonable searches and seizures requires generally that state and federal law enforcement obtain a warrant issued "by a neutral judicial officer based on probable cause prior to the execution of a search or seizure" that implicates the Fourth Amendment.  State v. Mattson, 2005 SD 71, ¶29, 698 NW2d 538, 548 (citing State v. De La Rosa, 2003 SD 18, ¶7, 657 NW2d 683, 685 (citing Terry v. Ohio, 392 US 1, 20, 88 SCt 1868, 1879, 20 LEd2d 889

(1968))). Warrantless searches are permissible under particular circumstances, however, "[t]he State has the burden of proving that a warrantless search falls into a specific exception to the warrant requirement." *Id.* ¶30, 698 NW2d at 548 (citing State v. Hess, 2004 SD 60, ¶23, 680 NW2d 314, 324).

[¶17.]      The Fourth Amendment typically does not directly govern the conduct of tribal officials in Indian country. United States v. Schmidt, 403 F3d 1009, 1013 (8thCir 2005); United States v. Becerra-Garcia, 397 F3d 1167, 1171 (9thCir 2005); United States v. Clifford, 664 F2d 1090, 1091-92 n3 (8thCir 1981) (citing Santa Clara Pueblo v. Martinez, 436 US 49, 56, 98 SCt 1670, 1675, 56 LEd2d 106 (1978)); United States v. Erickson, 2008 WL 1803626, *1 (DSD 2008).  However, tribal power to investigate violations in Indian country is constrained by the limits contained in the Indian Civil Rights Act, which was enacted to secure the right to be free of arbitrary and unjust actions by tribal governments.[2] *Santa Clara Pueblo*, 436 US at 61, 98 SCt at 1678, 56 LEd2d 106 (quoting S.Rep. No. 841, 90th Cong., 1st Sess., pp 5-6 (1967)).  Additionally, the Indian Civil Rights Act has been

---

2.      Tribal authorities, including tribal law enforcement, have the "traditional and undisputed power to exclude persons whom they deem to be undesirable from tribal lands." United States v. Terry, 400 F3d 575, 579 (8thCir 2005). While it is undisputed that tribes have no jurisdiction to prosecute non-Indians for crimes committed on Indian lands, Oliphant v. Suquamish Indian Tribe, 435 US 191, 212, 98 SCt 1011, 1022-23, 55 LEd2d 209 (1978), tribal officers have authority to detain offenders and transport them to the proper state or federal authorities for criminal prosecution where the offender has "disturb[ed] public order on the reservation. . . ." Duro v. Reina, 495 US 676, 696-97, 110 SCt 2053, 2065-66, 109 LEd2d 693 (1990)). The ability to exclude non-Indian law violators from tribal lands carries with it the power to investigate such violations. *Id.* (citing Brendale v. Confederated Tribes and Bands of Yakima Indian Nation, 492 US 408, 422, 109 SCt 2994, 3003, 106 LEd2d 343 (1989).

extended to protect the rights of non-Indians while on tribal lands from unreasonable searches and seizures by tribal government. United States v. Terry, 400 F3d 575, 579-80 (8thCir 2005) (holding Indian Civil Rights Act required tribal police and Bureau of Indian Affairs officer to comply with reasonableness standards for search and seizure of non-Indian detained on reservation on suspicion of domestic abuse); United States v. Keys, 390 FSupp2d 875, 884 (DND 2005) (statements made by non-Indian defendant illegally detained and questioned by Bureau of Indian Affairs officer on reservation after non-Indian status verified, were obtained in violation of 25 USC § 1302(2) and were suppressed).

[¶18.]     Several courts have addressed the issue of whether a search and seizure conducted by tribal government is subject to the same reasonableness standard embodied in the Fourth Amendment by virtue of the Indian Civil Rights Act, 25 USC § 1302(2). *See Terry*, 400 F3d at 579-80; *Becerra-Garcia*, 397 F3d at 1171; Ortiz-Barraza v. United States, 512 F2d 1176, 1180 (9thCir 1975); *Keys*, 390 FSupp2d at 884. Any such *"Duro"* detention is subject to the reasonableness standard embodied in the Fourth Amendment by virtue of the Indian Civil Rights Act, 25 USC § 1302(2), and Fourth Amendment case law is applied to the particular alleged violation. *Terry*, 400 F3d at 579-80 ("tribal officer must avoid effecting a constitutionally unreasonable search or seizure") (citing Duro v. Reina , 495 US 676, 696-97, 110 SCt 2053, 109 LEd2d 693 (1980)); *Becerra-Garcia*, 397 F3d at 1171 (holding "Indian Civil Rights Act . . . imposed an 'identical limitation' on tribal government conduct as the Fourth Amendment."); *Clifford*, 664 F2d at 1091 n3 (holding Fourth Amendment standards govern conduct of tribal officials by virtue of

Indian Civil Rights Act); *Erickson*, 2008 WL 1803626 at *1 (holding "Indian Civil Rights Act . . . imposed the same standards on tribal officers as the Fourth Amendment."). These courts generally assumed that the Fourth Amendment's exclusionary rule applied when tribal government violated the reasonableness limitation in the Indian Civil Rights Act, 25 USC § 1302(2), but did not provide any analysis for their supposition. *Terry*, 400 F3d at 580 (applying reasonableness standard in *Terry v. Ohio*, 392 US 1, 88 SCt 1868, 20 LEd2d 889 (1968) to Indian Civil Rights Act); *Becerra-Garcia*, 397 F3d at 1171; *Ortiz-Barraza*, 512 F2d at 1180; *Keys*, 390 FSupp2d at 884; *Clifford*, 664 F2d at 1090; *Erickson*, 2008 WL 1803626 at *1.

[¶19.]     *People v. Ramirez*, 148 CalApp4th 1464 (CalCtApp 2007), squarely addressed whether Congress intended the Fourth Amendment's exclusionary rule to apply to searches and seizures conducted by tribal government in Indian country. The *Ramirez* court noted that the language of the Indian Civil Right Act, enacted in 1968, is almost identical to the language of the Fourth Amendment, and "thus evidences a congressional intent to extend, as against the Indian tribes, 'the security of one's privacy against arbitrary intrusions by the police – which is at the core of the Fourth Amendment.'" *Id.* at 1470 (quoting Wolf v. Colorado, 338 US 25, 27-28, 69 SCt 1359, 1361, 93 LEd2d 1081(1949) *overruled by Mapp*, 367 US 643, 81 SCt 1684, 6 LEd2d 1081). The legislative history of the Indian Civil Rights Act lends support to this proposition. "A central purpose of the Indian Civil Rights Act was to 'secure for the American Indian . . . the broad constitutional rights afforded to other Americans,' and thereby to 'protect individual Indians from arbitrary and

unjust actions of tribal governments.'" *Id*. (quoting *Santa Clara Pueblo*, 436 US at 61, 98 SCt at 1678, 56 LEd2d 106 (quoting S.Rep. No. 841, 90th Congr., 1st Sess., pp 5-6 (1967)) (citing generally Burnett, An Historical Analysis of the 1968 'Indian Civil Rights' Act (1971-1972) 9 HarvLJ on Legis 557). The *Ramirez* court concluded that the Indian Civil Rights Act, 25 USC § 1302(2), limits tribal power to conduct unreasonable searches and seizures to the same degree that the Fourth Amendment limits the power of the federal and state governments. *Id*. at 1471.

[¶20.] The *Ramirez* court then turned its focus to the exclusionary rule. *Id*. at 1473. It noted that at the time of the enactment of the Indian Civil Rights Act in 1968, the United States Supreme Court had previously held in 1961 in *Mapp v. Ohio*, 367 US at 655-56, 81 SCt at 1692, 6 LEd2d 1081, that "the exclusionary rule was 'part and parcel of the Fourth Amendment's limitation upon governmental encroachment of individual privacy' and 'an essential part of both the Fourth and Fourteenth Amendments.'" *Id*. at 1473 (quoting *Mapp*, 367 US at 651, 658, 81 SCt at 1689, 1693, 6 LEd2d 1081).[3] The enactment of the Indian Civil Rights Act against the backdrop of *Mapp* evidences congressional intent to graft the Fourth Amendment exclusionary rule onto 25 USC § 1302(2). *Id*. at 1473-75. Thus, we are required to review a trial court's ruling on a motion to suppress evidence seized in

---

3. The United States Supreme Court would eventually reverse course and describe the exclusionary rule as a "judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." *Ramirez*, 148 Cal App4th at 1473 (quoting United States v. Calandra, 414 US 338, 348, 94 SCt 613, 620, 38 LEd2d 561 (1974)) (citing United States v. Leon, 468 US 897, 104 SCt 3405, 82 LEd2d 677 (1984)).

violation of the Indian Civil Rights Act, 25 USC § 1302(2) under Fourth Amendment case law, including application of the exclusionary rule.

*Were the Security Guards Government Actors?*

[¶21.]     Given that the exclusionary rule applies to the Indian Civil Rights Act, we next must determine whether the Tribe was engaged in "exercising powers of self government" as it pertains to Long Crow and the security guards when they conducted the search of Madsen's hotel suite.  In the alternative, Madsen argues that Long Crow and his security guards were agents of local law enforcement.  If the answer to either of these inquires is yes, then we must reverse and remand the matter to the trial court.

[¶22.]     "Indian tribes have the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity."  Indian Gaming Regulation, 25 USC § 2701(5) (1988).  For purposes of the Indian Gaming Regulation, Indian lands are defined as

> **(A)** all lands within the limits of any Indian reservation; and
>
> **(B)** any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power.

25 USC § 2703(4).

[¶23.]     According to the record below, the Flandreau Santee Sioux Tribe operates its casino under the provisions of the Indian Gaming Regulation on trust

land. The State's supplemental materials provided after oral arguments included a Gaming Compact between the Tribe and the State of South Dakota that substantiates that fact. As such, it is the Tribe's responsibility to conduct its gaming operations in compliance with Indian Gaming Regulation, which requires, among other things, adequate security measures and personnel. Indian Gaming Regulation, 25 USC § 2710(b)(E) – (F). The Flandreau Santee Sioux Gaming Commission's internal regulations detail the functions of its security department:

1. The Security people are responsible for the safety and protection of casino transactions giving support to the employees and ensuring guests of fair play. (See [Flandreau Santee Sioux Tribal Gaming Commission] (FSSTGC) Regulations, Section 1300, General 1300.15).

2. The Security Director shall employ and engage such Security personnel as may be reasonably necessary to insure the reasonable safety and security of the casino/Motel Complex and its guests and employees and of the monies incident to managing and operating the same at all times.

3. Protection from and elimination of any element or agent which jeopardizes the welfare and security of the casino's property, patrons and employees.

[¶24.] The Casino has implemented policies and procedures to assist security guards with maintaining compliance with the Flandreau Santee Sioux Tribal Gaming Commission's internal regulations, and ensuring casino operations are conducted fairly, cash accounted for accurately, and removing any "agent" from the property who presents a security risk. In addition to duties pertaining to casino operations, security guards also provides safety and security services at the Tribe's adjacent hotel property. The Casino's policies and procedures state that security guards are not permitted to search a casino guest or a guest's hotel room, or to

conduct an arrest. Instead, security guards may detain guests suspected of criminal conduct and contact local law enforcement officers who will determine and conduct any arrest or search that may be necessary. Based on these facts, regulations, policies and procedures, we conclude that the security guards were employed by the Tribe in its exercise of powers of self government as it relates to its lawful operation of its gaming operation under Indian Gaming Regulation, 25 USC § 2701 et al.[4]

[¶25.] The State argues that the security guards were acting as private citizens rather than agents of the Tribe in carrying out their duties. The State cites to *Ramirez*, 148 CalApp4th at 1471 n8, in support of its argument that the exclusionary rule cannot apply to Long Crow and the security guards because they were not tribal officers, but rather were employed as private security guards at the casino. The holding in *Ramirez* is not as narrow as the State suggests in its brief. *Ramirez* does not stand for the proposition that the exclusionary rule applies only to violations of the Indian Civil Rights Act by tribal officers, or as the State contends specifically to violations by tribal law enforcement officers. *Ramirez* stands for the proposition that the exclusionary rule applies to violations of the Indian Civil Rights Act by tribal governments. The *Ramirez* court also specifically rejected the very argument advanced by the State in the instant case: "we reject the People's argument that 'with respect to non-Indians, tribal officers have

---

4. We see no distinction between the two possible scenarios presented by the State, that Long Crow and his security guards were employed either directly by the Tribe, or by a third-party contractor on behalf the Tribe. Under either scenario, the Tribe was ultimately responsible for providing security for its gaming operations in compliance with the Indian Gaming Regulation, 25 USC § 2710(b)(2)(E) - (F).

essentially the same status as security guards who patrol their employers' premises.'" *Ramirez*, 148 CalApp4th at 1471 n8.

[¶26.]     Furthermore, the Fourth Amendment prohibition against unreasonable searches and seizures has never been limited exclusively to the conduct of law enforcement officers. Ferguson v. City of Charleston, 532 US 67, 76-77, 121 SCt 1281, 1287-88, 149 LEd2d 205 (2001) (holding that employees of a state run hospital were government actors subject to the strictures of the Fourth Amendment when conducting urine screenings for cocaine use on pregnant mothers without informed consent for purposes of criminal prosecution); New Jersey v. T.L.O., 469 US 325, 335-37, 105 SCt 733, 739-40, 83 LEd2d 720 (1985) (holding searches of student lockers by public school officials was government action subject to Fourth Amendment reasonableness standards). The reasonableness restraint is imposed on "'government action' –that is, 'upon the activities of sovereign authority.'" *T.L.O.*, 469 US at 335, 105 SCt at 739, 83 LEd2d 720 (citing Burdeau v. McDowell, 256 US 465, 475, 41 SCt 574, 576, 65 LEd 1048 (1921)). Hence, the Fourth Amendment is applicable to the activities of both civil and criminal authorities. *Id.* (holding public school officials subject to Fourth Amendment limits) (citing Camara v. Municipal Court, 387 US 523, 528, 87 SCt 1727, 1730, 18 LEd2d 930 (1967) (holding building inspectors subject to the Fourth Amendment standards); Marshall v. Barlow's Inc., 436 US 307, 312-13, 98 SCt 1816, 1820, 56 LEd2d 305 (1978) (holding Occupational Safety and Health Act inspectors subject to Fourth Amendment standards); Michigan v. Tyler, 436 US 499, 506, 98 SCt

1942, 1948, 56 LEd2d 486 (1978) (firemen entering privately owned premises to battle fire subject to Fourth Amendment standards)).

[¶27.]     Like the hospital staff of the state run hospital in *Ferguson*, and the public school officials in *T.L.O.*, Long Crow and the security guards were Tribal government actors by virtue of their status as employees of the Tribal casino operation, a distinctly Tribal governmental operation by virtue of Indian Gaming Regulation, 25 USC § 2701(5).  While it is undisputed that Long Crow and the security guards were not employed by the Tribe as law enforcement officers, they were employed in a civil capacity to provide safety and security services for the gaming operation on Tribal land.  As such, their actions when conducting searches and seizures were subject to the constraints of the Fourth Amendment, including the exclusionary rule, as embodied in the Indian Civil Rights Act, 25 USC § 1302(2).

[¶28.]     This becomes even clearer under the holding in *Becerra-Garcia*, 397 F3d 1167.  In that case, tribal officials with the title of tribal rangers were charged with the task of patrolling reservation land for trespassers.  *Id*. at 1169.  The tribal rangers lacked authority to stop suspicious vehicles, were not cross deputized by local law enforcement, and were without authority to conduct searches on the reservation.  *Id*. at 1169-70.  The only authority the tribal rangers had was to identify suspicious vehicles and make reports to tribal law enforcement officers, as trespassing was a significant problem on the reservation.  *Id*.  Tribal rangers spotted Becerra-Garcia's van on a remote dirt road on the reservation within a few weeks of reports of suspicious vehicles in the area.  *Id*. at 1170.  The tribal rangers

approached Becerra-Garcia's van from the rear, and engaged their hazard lights. *Id.* Becerra-Garcia stopped his vehicle and after failing to communicate with the tribal rangers in either English or Spanish, Becerra-Garcia motioned the rangers toward the van. *Id.* Upon approaching the van, the tribal rangers saw twenty individuals who appeared to be illegal aliens in the back of the van. *Id.* The tribal rangers held Becerra-Garcia until tribal law enforcement arrived and conducted an arrest. *Id.* At the trial court level, Becerra-Garcia's motion to suppress all evidence discovered as a result of the stop was denied. Becerra-Garcia appealed. *Id.*

[¶29.] On appeal, Becerra-Garcia argued that the tribal rangers were acting in the capacity of private citizens and not as government actors due to their lack of authority to stop cars on the reservation. *Id.* at 1171. The Ninth Circuit Court of Appeals held the argument "while creative, misses the mark." *Id.* at 1172. The test was not whether the tribal rangers were without law enforcement authority. *Id.* Rather, the test was whether the tribal rangers were government actors under the three-part test in *United States v. Reed*, 15 F3d 928, 931 (9thCir 1994). *Id.* The test was (1) whether the government, in this case the tribal government represented by tribal law enforcement, knew of and acquiesced in the tribal rangers' activities, (2) whether the tribal rangers intended to assist tribal government, and (3) whether the tribal rangers acted to further the ends of tribal government rather than the tribal rangers' own ends. *Id.* (citing *Reed*, 15 F3d at 931 (citing United States v. Miller, 688 F2d 652, 657 (9thCir 1982))). That court concluded that the function of the tribal rangers was to assist the tribal police department and the United States Border Patrol by monitoring remote areas of the reservation, and that both

-17-

government agencies were aware of the tribal rangers' purpose and activities. *Id*. Furthermore, the tribal rangers stopped Becerra-Garcia to enforce the criminal trespass laws of the tribal nation, not for their own personal benefit. *Id*. Thus, that court held the tribal rangers were government actors and subject to the constraints of the Indian Civil Rights Act. *Id*.

[¶30.] The Ninth Circuit Court of Appeals also noted that the tribal rangers exceeded the scope of their authority, as testified to by the tribal rangers involved in the stop, when they initiated the stop of Becerra-Garcia's van. *Id*. at 1173. Despite that fact, that court also held the constraints of the Indian Civil Rights Act applied, as the rangers' authority under tribal law "[was] not the linchpin for determining the admissibility of the evidence obtained as a result of the stop." *Id*. at 1173. Despite lacking Tribal authority to make the traffic stop, that court held that the stop was reasonable within the meaning of the Fourth Amendment because the rangers had reasonable articulable suspicion to investigate Becerra-Garcia for criminal trespass.[5] *Id*. at 1174-75. That court declined to adopt Becerra-Garcia's argument that a bright-line rule should be adopted for determining reasonableness: "that a stop is automatically unreasonable if the officers lacked authority to conduct the seizure." *Id*. at 1175. Instead, that court adhered to the rule that reasonableness must be determined on a case-by-case basis rather than by a bright-line rule. *Id*. (citing *Terry,* 392 US at 17, 20-21, 88 SCt 1868, 20 LEd2d 889

---

5. Becerra-Garcia did not challenge the district court's finding that the rangers had reasonable articulable suspicion to investigate for criminal trespass. *Becerra-Garcia,* 397 F3d at 1174.

#24654

("rejecting a 'rigid all-or-nothing model of justification and regulation under the [Fourth] Amendment' in favor of a flexible model that considers the scope of the intrusion and its justification"); Go-Bart Importing Co. v. United States, 282 US 344, 357, 51 SCt 153, 75 LEd 374 (1931) ("'There is no formula for the determination of reasonableness. Each case is to be decided on its own facts and circumstances'")).

[¶31.]        Thus, in the instant case, the issue is not determined by whether Long Crow and the security guards exceeded the boundaries of their authority to conduct searches under the Flandreau Santee Sioux Gaming Commission's rules and regulations. Instead, we are guided by the legal conclusion that Long Crow and the security guards were government actors charged by the Tribe with the safety and security of the casino and hotel operation. The Tribe, through the Flandreau Santee Sioux Tribal Gaming Commission, knew of the security guards' policies and procedures. Furthermore, Long Crow testified he conducted the search in order to protect casino and hotel property, and not for his own purposes. The security guards, therefore, were Tribal government agents whose conduct was limited by the constraints of the Indian Civil Rights Act.

[¶32.]        Because we hold that the security guards were Tribal government actors, we do not need to address Madsen's alternative argument that Long Crow and the security guards were also agents of local law enforcement. However, the circuit court never addressed the reasonableness of the search and whether the consent given by Carter to Long Crow to enter and search the hotel suite was valid.

#24654

[¶33.]    We remand the matter to the circuit court for further proceedings consistent with this opinion.  The circuit court is directed to use Fourth Amendment case law for guidance as to whether the search by Long Crow and the security guards was reasonable under the circumstances.  Reversed and remanded.

[¶34.]    KONENKAMP, ZINTER, and MEIERHENRY, Justices, and SABERS, Retired Justice, concur.